DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Daniel S. Duffield has appealed from the judgment of the Summit County Court of Common Pleas that found him guilty of murder, involuntary manslaughter, endangering children, and felonious assault. This Court affirms.
 I {¶ 2} On October 26, 2004, an indictment was filed against Defendant-Appellant Daniel S. Duffield for one count of murder, in violation of R.C. 2903.02(B), a special felony; one count of involuntary manslaughter, in violation of R.C. 2903.04(A), a felony of the first degree; two counts of endangering children, in violation of R.C. 2919.22(B)(2), both felonies of the second degree; and one count of endangering children, in violation of R.C. 2919.22(A), a felony of the third degree. Appellant waived reading of the indictment and entered "not guilty" pleas to all counts of the indictment.
 {¶ 3} On December 21, 2004, a supplemental indictment was filed against Appellant charging him with three counts of felonious assault, in violation of R.C. 2903.11(A)(1), all felonies of the second degree. The following day, Appellant waived reading of the supplemental indictment and entered "not guilty" pleas to the three counts in said indictment.
 {¶ 4} A jury trial commenced on February 22, 2005. On March 1, 2005, the jury found Appellant guilty of: murder while committing or attempting to commit the offense of endangering children (count one); involuntary manslaughter (count two); endangering children with a previous conviction of endangering children (count three); two counts of endangering children (counts four and five); and two counts of felonious assault (counts 10 and 11). Appellant was found not guilty of count nine, felonious assault.
 {¶ 5} The trial court sentenced Appellant to a term of incarceration of 15 years to life on the murder conviction; for sentencing purposes, the trial court merged the involuntary manslaughter and first two endangering children convictions with the murder conviction. Appellant was sentenced to five years incarceration on his third endangering children conviction. The trial court merged Appellant's two felonious assault convictions and sentenced Appellant to eight years incarceration on those convictions. All sentences were ordered served consecutively to each other.
 {¶ 6} Appellant has appealed his convictions and sentence, asserting three assignments of error.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED IN DENYING THE ADMISSION OF EVIDENCE TENDING TO SHOW THAT ANOTHER PERSON WAS RESPONSIBLE FOR MURDER AND ALL OTHER CRIMES AGAINST THE VICTIM."
 {¶ 7} In his first assignment of error, Appellant has argued that the trial court erred in excluding evidence tending to show that the victim's mother was responsible for her death, not Appellant. Specifically, Appellant has argued that the trial court erred in denying him the opportunity to present evidence that went to "the very heart of appellant's defense[.]"
 {¶ 8} The State has argued that Appellant has failed to comply with App.R. 16. We agree.
 {¶ 9} An appellant has the burden on appeal. See App.R. 16(A)(7); Loc.R. 7(A)(7). "It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." State v. Taylor (Feb. 9, 1999), 9th Dist. No. 2783-M, at 7. See also, App.R. 16(A)(7); Loc.R. 7(A)(7). Pursuant to App.R. 16(A), an appellant's brief shall include the following:
"(7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."
See, also, Loc.R. 7(A)(7). In addition to reflecting the requirements specified in App.R. 16(A)(7), Loc.R. 7(A)(7) provides that "[e]ach assignment of error shall be separately discussed and shall include the standard of review applicable to that assignment of error."
 {¶ 10} "It is not the function of this court to construct a foundation for [an appellant's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." Kremer v. Cox (1996),114 Ohio App.3d 41, 60. Moreover, it is not the duty of this Court to develop an argument in support of an assignment of error if one exists. Cardone v. Cardone (May 6, 1998), 9th Dist. Nos. 18349 and 18673, at 22. As we have previously held, we will not guess at undeveloped claims on appeal. See McPherson v. Goodyear Tire Rubber Co., 9th Dist. No. 21499, 2003-Ohio-7190, at ¶ 31, citing Elyria Joint Venture v. Boardwalk Fries, Inc. (Jan. 3, 2001), 9th Dist. No. 99CA007336. Further, this Court may disregard arguments if the appellant fails to identify the relevant portions of the record on which the errors are based. See App.R. 12(A)(2); Loc.R. 7(E).
 {¶ 11} In the instant matter, Appellant has argued that the trial court erred in denying the admission of evidence that would show someone else killed the victim. But he has failed to include in this assignment of error any pertinent references to the record or argument in support of his assignment of error. While Appellant's Statement of the Case and Facts contained a summary of the procedural facts of the case and eight evidentiary points he was allegedly prevented from making, he has failed to make the necessary identifications and arguments regarding the alleged error of the trial court. Mere mention of motions or questions that were allegedly wrongfully decided or denied is not sufficient to demonstrate error on appeal. An appellant cannot cite a string of errors and then not argue them in his assignment of error. It is not the duty of this Court to parse out arguments regarding the eight alleged mistakes of the trial court; such a duty belongs to Appellant. We find Appellant failed to meet his burden of discussing the alleged errors in his assignment of error and arguing the assignment's merit; thus, we are not required to address this assignment of error. See App.R. 12(A)(2); Loc.R. 7(E).
 {¶ 12} Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 13} In his second assignment of error, Appellant has argued that his convictions were against the manifest weight of the evidence. Specifically, he has argued that the only evidence presented to the jury connecting him to the victim's death was unreliable and contradicted by other evidence. We disagree.
 {¶ 14} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 15} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 16} In the instant appeal, Appellant was convicted of one count of murder while committing or attempting to commit the offense of endangering children. Pursuant to R.C. 2903.02(B), "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence[.]" Appellant was also convicted of involuntary manslaughter; pursuant to R.C. 2903.04(A), "No person shall cause the death of another * * * as the proximate result of the offender's committing or attempting to commit a felony."
 {¶ 17} Appellant was convicted on three counts of child endangering. Two of those convictions were pursuant to R.C.2919.22(B)(2), which provides: "No person shall * * * [t]orture or cruelly abuse [a child under eighteen years of age.]" Appellant was also convicted of one count of child endangering under R.C. 2919.22(A). Pursuant to R.C. 2919.22(A):
"No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 18} The jury also found Appellant guilty of two counts of felonious assault. Pursuant to R.C. 2903.11(A)(1), "No person shall knowingly * * * [c]ause serious physical harm to another[.]"
 {¶ 19} During the trial, the State presented testimony from several witnesses, beginning with Officer Jennifer Imhoff of the Springfield Township Police Department ("STPD"). She testified to the following. On October 6, 2004, she was called to 1200 Abington Road regarding an infant that was not breathing. Officer Imhoff and the responding fire department arrived on the scene at the same time and found the infant, Jacqueline, lying on the couch. The paramedics placed the baby on the floor and started working on her. Officer Imhoff observed that the infant's mother, Vanessa McGlumphy ("McGlumphy"), was "kind of upset, talking, crying, wondering what was going on." Officer Imhoff also saw Appellant on the scene and he said that "he had checked on the baby about 10 minutes before we got there." Officer Imhoff arrived at the house at 12:42 p.m. and returned to the house at 1:58 p.m. to secure the scene because the hospital reported that it suspected child abuse.
 {¶ 20} Ann Henrick ("Henrick") testified to the following for the State. She is a caseworker at the Summit County Children Services intake center. In August 2004, she visited 1200 Abington Road to address a referral she received about housing concerns. When Henrick arrived at the house, Appellant, McGlumphy, and McGlumphy's twin daughters, Layloni and Jacqueline, were sitting on the front porch. Henrick interacted with the children and did not observe any problems. She asked Appellant if he had ever been charged with any crimes and he answered no. Appellant also denied living in the house. Henrick asked Appellant for information so she could perform a background check on him and he complied. She entered the house to investigate where the children were living. The children and their mother lived in an attached garage with electricity, a bed for McGlumphy, and a place for the children to sleep. Henrick recommended that McGlumphy move the children into the house. The next time Henrick saw Appellant was at the hospital the day Jacqueline died.
 {¶ 21} The State called Mike Beckman ("Beckman") as its next witness. Beckman, a Springfield Township firefighter/paramedic, testified to the following. Beckman responded to 1200 Abington Road on October 6, 2004 after a 911 caller said a baby was blue and then hung up. Upon entering the home, Beckman placed Jacqueline on the floor and began his assessment. He observed the child was "extremely cold" and "her extremities, fingertips, eyelids, and lips were blue." Once in the ambulance, he cut Jacqueline's clothes off to complete the assessment and observed that "there was an extensive amount of bruising on the arms, legs, abdomen, torso area; all different colored bruising, showing the different stages of healing." The paramedics were never able to restore her pulse or obtain any response from her.
 {¶ 22} Daniel Cooper ("Cooper"), owner of Heaven and Hell Tattoos in Akron, testified to the following for the State. Cooper was Jacqueline's father. Jacqueline and her fraternal twin sister, Layloni, were born in September 2003. McGlumphy and the twins lived with Cooper until July 2004 when McGlumphy moved to 1200 Abington Road. Cooper met Appellant when he came into the tattoo parlor and inquired about buying tattoo equipment. Cooper attended the twins' birthday party in September 2004 and noticed that Jacqueline had bruises on her face and head and she acted like something was wrong with her leg.
 {¶ 23} Cooper continued his testimony and identified State's Exhibit 6 as a tattoo needle. When asked about October 6, 2004, Cooper testified that he received a message that Jacqueline had been taken to Akron Children's Hospital ("Children's") and he went to the hospital. Cooper visited his daughter and provided the following description of her body: "she had bruises all over her, all over her head, upper chest, big bruise almost covered her entire ribs, and her lip was split open, and she was pale." Cooper also observed that her left eye was swollen open.
 {¶ 24} Cooper testified to the following on cross-examination. He had received a few messages from McGlumphy in the morning of the day Jacqueline was killed. McGlumphy was upset when he spoke to her around 10:30 that morning; she was screaming at him about money. Cooper could hear the kids crying over the phone. He did not recall McGlumphy telling him to come and get the girls. He also did not recall McGlumphy stating that if he did not come and get them she did not know what would happen or what she would do. He also did not remember telling the police that McGlumphy made those statements.
 {¶ 25} After refreshing his recollection with a transcript of his recorded conversation with a detective, Cooper continued testifying to the following on cross-examination. He remembered telling the detective that McGlumphy told him she did not know what she was going to do and that she was going to have a nervous breakdown; Cooper also remembered telling the detective that he heard "hitting" when talking to her that morning. Cooper never trained McGlumphy in giving tattoos.
 {¶ 26} Detective Carl Blasdel ("Det. Blasdel") of the STPD testified to the following. He was assigned to investigate Jacqueline's death. Det. Blasdel first responded to 1200 Abington and found the house locked and no one home. He radioed to have the house secured until they could gain entry and then he responded to Children's. Det. Blasdel later returned to the house and obtained consent to search it.
 {¶ 27} A videotape of the house was made during the search and Det. Blasdel testified to its contents as the tape was played for the jury. The video showed the general layout of the house and each room. The living room contained a used infant t-shirt/onesie, a towel, and items used by the paramedics. Jacqueline lived in the converted garage which contained a large sofa bed and two pack and play type cribs. One of the cribs contained what appeared to be blood stained blankets and a couch pillow that were sent to the lab for tests. A pink baby's blanket was found by that crib and it too had what appeared to be blood stains. The pink blanket was also sent to the lab. The video also showed a crib mattress with a mermaid crib sheet on it; the mattress was leaning up against the side of the garage door area. When the crib with the stained blankets was lifted to be tagged into evidence, other relevant items were found. One such item was the tattoo needle previously identified by Cooper. Det. Blasdel also identified a stained child's sock that was found under the sofa bed and several other items and photographs from the house.
 {¶ 28} Det. Blasdel testified on cross-examination that he also observed and took into evidence McGlumphy's prescription bottle of Zoloft.
 {¶ 29} Chad Britton ("Britton"), a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified to the following for the State. As part of his duties, Britton examines items submitted by law enforcement officers for bodily fluids and generates a report on his findings. Specifically, Britton examined items from the instant matter and created a report to reflect his findings. Britton first testified to his examination of the needle found at the house; it tested negative for blood, but appeared to have some type of body tissue present. The blankets, t-shirt, sock, couch pillow, crib sheet, and crib mattress recovered by the police from the house tested presumptive positive for blood; each item contained several stains that tested positive for blood. After the stains were determined to be blood, further samples were taken and given to another scientist for further testing.
 {¶ 30} On cross-examination, Britton was asked if he tested the items for other substances; he responded that he tested the t-shirt for semen, but not juice.
 {¶ 31} On re-direct, Britton testified that the t-shirt tested positive for semen.
 {¶ 32} Linda Eveleth ("Eveleth") testified to the following. Eveleth is a forensic scientist for BCI and works with Britton. Eveleth conducted DNA analysis on the items Britton found and on Jacqueline. Eveleth testified that the samples from the tissue on the needle, and the samples from the blood stains on the blankets, the t-shirt, the pillow, the sheet, the mattress, and the sock were consistent with Jacqueline's DNA. Two blankets contained mixed DNA samples; one blanket contained Jacqueline's DNA and that of an unknown male; and the other blanket contained Jacqueline's DNA and that of an unknown female. Of the samples that contained only Jacqueline's DNA, the chance of someone else matching the samples was one in two quadrillion, 672 trillion.
 {¶ 33} Eveleth testified on cross-examination that she did not obtain a DNA sample from McGlumphy to test if it was her DNA on the needle.
 {¶ 34} On re-direct Eveleth testified that the DNA from the needle was expected to be present in only one in two quadrillion, 672 trillion individuals.
 {¶ 35} The State's next witness, Courtney Sabolek ("Sabolek") testified to the following. She was a 17 year-old high school senior and lived at 1200 Abington Road. Sabolek knew Appellant as a friend and he previously lived in the basement garage at her house. Appellant lived in the basement garage with McGlumphy and the twins. Sabolek would see the twins almost every day. On the morning Jacqueline died, Sabolek went to school. She returned home around 11:50 a.m. and Appellant, the twins, and Sabolek's stepbrother were home. When Sabolek entered the house, Appellant was walking from the kitchen to the living room with Jacqueline's twin. Sabolek asked where Jacqueline was and Appellant told her she was downstairs in the garage basement. Appellant changed the other twin's diaper and then went downstairs to get her a change of clothes. Appellant was downstairs for approximately three minutes; Sabolek did not hear anything while he was downstairs. Appellant dressed the other baby, retrieved a bottle from the refrigerator, and went back downstairs for another three minutes. He then came back upstairs and did not say anything. From the time she arrived home until Jacqueline was discovered unresponsive, Sabolek did not hear anything coming from the basement garage.
 {¶ 36} Sabolek continued her testimony, testifying to the following. McGlumphy and Sabolek's mother's boyfriend came home around 12:30. After playing with some joke toys she had purchased, McGlumphy went downstairs and came back up about a minute later with Jacqueline and said the baby was not breathing. McGlumphy laid Jacqueline on a loveseat, checked her mouth for an obstruction, and began CPR. Sabolek called 911. Sabolek rode in the police car with McGlumphy to the hospital. The first time Sabolek saw Jacqueline the day she died was when McGlumphy brought her upstairs saying she was not breathing.
 {¶ 37} Sabolek testified to the following concerning Jacqueline's condition on October 5, the evening before she was killed. Jacqueline was sick and not herself. She was crying constantly. Sabolek's mother told McGlumphy to take the twins to the hospital because something was wrong with them; McGlumphy was hesitant at first, but complied. Sabolek called the hospital to make sure McGlumphy and Appellant actually took the twins to the hospital. Before they left for the hospital, Sabolek noticed that Jacqueline's upper lip was cut.
 {¶ 38} Sabolek testified to the following on cross-examination. McGlumphy did not want to take the twins to the hospital on October 5; Sabolek's mother threatened to call Children's Services if McGlumphy did not take the twins to the hospital. When she arrived home after school on October 6, Appellant did not seem upset, angry, or mad. He was not cursing at Jacqueline's twin; everything seemed normal. Sabolek's little brother did not seem upset either. When Appellant went to the refrigerator he grabbed a bottle of juice and took it downstairs.
 {¶ 39} David Lambert ("Lambert") testified to the following for the State. He lived at 1200 Abington Road with his girlfriend, Sabolek, and his six-year old son. McGlumphy, Appellant, and the twins moved in around July 2004. Lambert and his girlfriend invited McGlumphy to move in because of the twins. At first, Lambert did not want Appellant moving in, but he changed his mind when Appellant started helping out by watching Lambert's son. Appellant had tattoo equipment in the house and he had given tattoos in the house. When McGlumphy was debating taking the twins to the hospital on October 5, Appellant did not encourage her to take them. When they got back from the hospital they took the twins downstairs and did not come back upstairs.
 {¶ 40} Lambert continued testifying to the following. On October 6, he left the house around 8:15 and took his son for school screening. His girlfriend and Sabolek were already gone when he left. Appellant, McGlumphy, and the twins were still home when they left; he did not see any of them that morning. Lambert and his son arrived home around 10:15; he did not see the twins at that time. He then took McGlumphy to CVS to fill a prescription for the twins. Lambert left his son with Appellant and the twins. It took about 20 minutes to get to the pharmacy and about five minutes to fill the prescription. When Lambert and McGlumphy came home, Appellant was on the porch on the phone and everyone else was in the house. About 15-20 seconds after McGlumphy went downstairs, Lambert heard a yell and she came up carrying Jacqueline. Jacqueline was "all blue and pale and like had a yellow tint to her skin." McGlumphy and Sabolek went along when Jacqueline was taken to the hospital; Appellant, Lambert, and Lambert's son stayed at the house. Appellant went to the hospital about 10 minutes after the ambulance left.
 {¶ 41} Lambert testified to the following on cross-examination. When he got back from CVS with McGlumphy, Appellant was on the porch and when they all entered the house Appellant was "pacing back and forth" in the living room. He also testified that McGlumphy was reluctant to take the twins to the hospital the evening of October 5.
 {¶ 42} The State called Dr. Steiner as its next witness and he testified to the following. He is a doctor in emergency department at Children's and medical director of the CARE Center, which is a center dedicated to the evaluation and treatment of children that have been alleged to be abused or neglected. Jacqueline was treated at Children's on July 4, 2004, September 30, 2004, October 5, 2004, and October 6, 2004. Dr. Steiner treated Jacqueline on October 5, 2004 when her mother brought her in for treatment of cold symptoms. Jacqueline had a fever, cough and congestion. Jacqueline also had bruising on her chest and face and a lip laceration. Dr. Steiner spoke with McGlumphy and was told that Jacqueline was in her crib standing at the crib rail, holding on to it and jumping on the mattress. Jacqueline lost her balance and her chin hit the railing, McGlumphy lunged towards her to stop her from falling backwards and McGlumphy fell into the crib causing it to collapse onto Jacqueline. Dr. Steiner was skeptical of the explanation, but his concerns were lessened when McGlumphy was able to provide detailed answers to his questions concerning the crib. The bruises were small and appeared to be healing, which matched the time McGlumphy said the crib collapsed. The bruises were non-life threatening, Jacqueline had no symptoms of injury, and she tried to crawl to her mother for consoling during the exam. Dr. Steiner testified that Jacqueline did not have a lacerated liver, a fractured leg, or fractured vertebrae that night, and he did not see any puncture wounds on her face when she was brought to the hospital by her mother. Jacqueline was released to her mother around 8:00 p.m. on October 5, 2004. The next time Dr. Steiner saw Jacqueline was the next day after she had passed away and was lying on the X-ray table.
 {¶ 43} Dr. Steiner continued testifying to the following. Jacqueline appeared very different on October 6 than she had the evening before. She had "tremendous body surface injuries." She had fresh bruises all over her face, chest, abdomen, neck, and lower extremities. Jacqueline's right leg had two recent fractures and her left leg had a healing fracture, probably two weeks old. The X-ray of her ribs showed multiple new and old fractures. Jacqueline also had a fracture of the left forearm near her wrist and at least two compression fractures of her vertebrae, which were most likely caused by being slammed down. Dr. Steiner testified that Jacqueline died from a fracture and dislocation of the neck from her skull; put bluntly, her head became detached from her spine.
 {¶ 44} Dr. Steiner testified that Jacqueline's weight had suffered a dramatic drop within the last month of her life. He also explained that all of her fractures would cause her great pain and she would be difficult to console. When Jacqueline was in the hospital on the evening of October 5 her temperature was 100.4 and at 1:00 p.m. the next day at the hospital her temperature was 90.5. Dr. Steiner testified that it would have taken at least an hour for her temperature to drop 10 degrees. When asked about the digestion of milk, Dr. Steiner testified that it would take about 90 minutes for a baby to digest milk. After reviewing Jacqueline's medical files and her body, Dr. Steiner concluded that "she was the victim of abusive injuries, she had been beaten and sustained multiple injuries to her body that resulted in her death." Her death was "a result of physical abuse."
 {¶ 45} Dr. Steiner testified to the following on cross-examination. Jacqueline's injuries were intentionally inflicted in succession. McGlumphy was physically able to inflict all of the injuries Jacqueline suffered. Medical records show that Layloni had also suffered a leg fracture. Dr. Steiner testified that McGlumphy had described Jacqueline as a lazy child. When asked about the digestion of juice, Dr. Steiner testified that it digests faster than milk.
 {¶ 46} Dr. Scott, a pediatric emergency medicine fellow at Children's, testified to the following for the State. Dr. Scott was working in the ER on October 6 and remembered when Jacqueline was brought in. She recognized immediately that Jacqueline was the victim of a trauma; she was pale, cool, and covered in bruises. Dr. Scott testified that it would take at least an hour for a baby's temperature to drop from 100 degrees to 90 degrees. Dr. Scott pronounced Jacqueline dead at 1:10 p.m. When she was examining her, Dr. Scott observed that there was blood in Jacqueline's diaper; her clothes also had blood on them. When Dr. Scott informed McGlumphy that Jacqueline had died, McGlumphy was upset, started crying, and fell to the floor. Dr. Scott's final determination on this case was that Jacqueline was tortured and abused.
 {¶ 47} Dr. Scott continued testifying to the following. While examining Jacqueline she observed 20-25 pinpoint needle marks on the bottom of her heels and retinal hemorrhages in her left eye, which indicates shaking or other abuse.
 {¶ 48} Dr. Lisa Kohler, the chief medical examiner for Summit County, testified to the following. Jacqueline died when she was 13 months old and her death was ruled a homicide. Jacqueline's head became dislocated from her neck which could have been caused by a twist, a shake, or being hit against something. While showing the jury an autopsy photograph, Dr. Kohler described several bruises on Jacqueline's head. She testified that there were approximately 45 bruises involving the head and neck area, as well as injuries around the brain and eyes. Jacqueline also had several bruises on her face, a cut lip, and scratches on her face. Dr. Kohler showed a photograph of Jacqueline's head after it was shaved for the autopsy and it revealed multiple small bruises, some in clusters. She pointed out several bruises along Jacqueline's jaw line, neck, right ear area, and back. Dr. Kohler testified that Jacqueline had a cluster of nine shallow puncture wounds near her left ear lobe. She also identified numerous bruises on Jacqueline's torso area and multiple rib fractures. Dr. Kohler also testified to a laceration of Jacqueline's liver and to retinal hemorrhages and bleeding around the optic nerve, which could have been caused by shaking or increased pressure through her chest. The liver injury occurred minutes to hours before Jacqueline was brought into the hospital on October 6.
 {¶ 49} Dr. Kohler continued testifying to the following. Jacqueline's abdominal cavity contained about 55 milliliters of blood. Jacqueline's stomach contained less than one milliliter of a green/brown thick fluid and it was unclear whether the contents were from something Jacqueline ingested prior to death or fluid generated by the stomach itself. Autopsy photos also showed numerous bruises on Jacqueline's arms and legs; Dr. Kohler also testified to the leg fractures previously discussed. Dr. Kohler identified and testified to the multiple small, pinpoint wounds on the bottom of Jacqueline's feet; the right foot had 13 puncture wounds and the left foot had 25 puncture wounds. Dr. Kohler testified that Jacqueline was tested for brittle bone disease and she did not have the disease. Dr. Kohler calculated it would have taken a period of hours for Jacqueline's temperature to drop from 100.5 degrees to 90 degrees.
 {¶ 50} Dr. Kohler testified to the following on cross-examination. She did not observe any apparent pattern to the puncture wounds. Dr. Kohler testified that this was not a case of shaken baby syndrome. Aside from the puncture wounds, all the other injuries were the result of blunt force injuries.
 {¶ 51} Dr. Kohler testified on re-direct that the injuries inflicted on Jacqueline would take more than 30 seconds to inflict and that her body temperature could not have dropped from 100 degrees to 90 degrees in a 30 minute time period.
 {¶ 52} Donnell Green ("Green") testified to the following for the State. Green was currently incarcerated in the Summit County Jail; he entered the jail on October 8, 2004 and shared a cell with Appellant. Appellant told Green he was in jail on a child endangering case and that his lawyer told him not to talk to anyone; but, as time went on Appellant opened up to Green. Appellant told Green that he and McGlumphy were supposed to turn themselves in and instead they went on the run for two days. Appellant told him that Jacqueline was sick and he and McGlumphy took her to the hospital and she received some medication and drops for her eyes. Appellant said they were not able to fill the eye drop prescription that night. Appellant said that the baby had a split lip from the crib collapsing. Green knew Jacqueline and Layloni's names. Appellant told Green that after returning from the hospital and pharmacy, he and McGlumphy partied.
 {¶ 53} Green continued his testimony as follows. After Appellant was indicted, he came back to the cell and showed Green the indictment. Green kept asking what was going on because until then he didn't know it was a murder case. Appellant did not respond and showed no emotion. Appellant told Green he was a "cool" guy and asked Green if he could trust him. Appellant then told him that Jacqueline was thrown into the crib and that was how she split her lip. Appellant stated that he belonged to the Wicca faith, but that he was a good witch; Appellant explained Wicca and its beliefs, including the ability to send curses. Appellant then repeatedly asked Green if he could trust him and Green asked if Appellant had something he needed to get off his chest.
 {¶ 54} Green testified that Appellant confessed to shaking the baby. He said that he and McGlumphy had partied the night before and he awoke with a headache. Appellant said McGlumphy and Lambert left to get Jacqueline's eye drops so he was left at the house with the twins and another child. Appellant told Green that Jacqueline was downstairs while he was upstairs with the other children and Jacqueline would not stop crying. Appellant then took Jacqueline some juice and went back upstairs. Appellant said Jacqueline would not stop crying; Appellant tried rocking her to sleep, but she would not go to sleep. Appellant said he shook and shook Jacqueline, put her down, and she stopped crying. When Appellant was telling Green what happened he was telling Jacqueline to "shut up, shut up." Green testified that Appellant told him when McGlumphy discovered Jacqueline she brought her upstairs and she and Lambert started CPR. Appellant told Green that while McGlumphy called 911 Lambert continued CPR. Green testified that Appellant told him McGlumphy rode with the ambulance and he, Lambert, and the other children drove separately to the hospital. Appellant told Green how he was formerly friends with Jacqueline's father and he paid his respects to him at the hospital.
 {¶ 55} Green continued testifying to the following. Appellant told him how he formerly worked at Heaven and Hell Tattoo Parlor and about Wiccas. Appellant explained to Green the Wicca sign, which was three half circles. Appellant told Green he punctured Jacqueline's foot with the Wicca sign. Appellant said that he and McGlumphy were doing an experiment and were going to raise Jacqueline as a Wicca, but not Layloni. Green testified that Appellant called Jacqueline a whiner baby because she cried a lot; Layloni did not cry a lot. Appellant told Green that McGlumphy was a Wicca too. Appellant did not cry or show remorse when he was telling Green what happened. The next day, Green told a member of the Wayward Ministry what Appellant said and later spoke with a detective about Appellant's statements.
 {¶ 56} Green testified that at the time Appellant confessed to him, he had a pending fifth degree felony drug offense. Green testified that he did not receive any promises or consideration from the prosecution; he also pointed out that he was currently in prison. He testified that he was not made any promises concerning his future. Green also had a pending theft case out of a different county and he was not promised anything on that case. Green came forward with the information because he has a daughter of his own and he would expect someone to come forward if his child was murdered. Green also testified that Appellant drew things for him and that Appellant was a good artist.
 {¶ 57} Green testified to the following on cross-examination. He admitted having been to prison a couple of times. Green was serving a six-month sentence on a drug charge punishable by a year in prison. Under Green's agreement with the State, he would receive the minimum sentence if he cooperated in the case against Appellant. Appellant told him that he and McGlumphy had used methamphetamine the night before Jacqueline died and that McGlumphy and Lambert were going to get more when they went to get the eye drops. Green testified that he was not promised anything for his testimony. After being questioned about his honesty, Green testified that he wouldn't be testifying and possibly sending a man away for life to save himself a short time in jail.
 {¶ 58} Green testified to the following on re-direct. He was not promised a better deal if he testified against Appellant. He made the statement to the detective before he entered his plea. He entered his plea before he spoke to the prosecutors on Appellant's case. Green testified that at no time did he make a deal regarding his criminal matters and testifying against Appellant.
 {¶ 59} On re-cross, Green testified that he did mention his criminal matters to the detective who took his statement.
 {¶ 60} Detective Holsopple of the STPD testified to the following. Det. Holsopple aided in the investigation of Jacqueline's death. He responded to the hospital and began interviewing potential witnesses and gathering evidence. After assisting in finding placement for the other children, Det. Holsopple went to 1200 Abington Road. He collected evidence at the scene, returned to the station and completed paperwork, and then observed Jacqueline's autopsy. As part of his investigation, Det. Holsopple obtained a copy of the receipt from CVS showing that McGlumphy picked up Jacqueline's eye drops at 11:32 a.m. on October 6. Appellant was initially charged with child endangering and Det. Holsopple attempted to serve a warrant on him, but after several attempts he was unable to locate Appellant.
 {¶ 61} After the admission of several State exhibits, Appellant made a Crim.R. 29 motion. The trial court overruled the motion. Once back in the presence of the jury, the trial court informed the jury that the parties had reached a stipulation concerning Appellant. The parties stipulated that on October 25, 2000 in Portage County Appellant was found guilty of child endangering.
 {¶ 62} Appellant then called Lambert as his first witness. He testified that McGlumphy had done tattoos and he showed the jury the one she gave him. McGlumphy also knew how to do body piercings.
 {¶ 63} Lambert testified to the following on cross-examination. Appellant gave tattoos at 1200 Abington Road and had his own equipment in the house. Appellant had given tattoos in the house the week Jacqueline died. Appellant had also given Lambert tattoos.
 {¶ 64} Mary Ann Sabolek ("Mary Ann") testified to the following for Appellant. She lives at 1200 Abington Road and Sabolek is her daughter. Mary Ann spoke with the police and the prosecutors regarding this case. When Mary Ann returned home from work on October 5, 2004, she noticed that Jacqueline was very sick. Mary Ann told McGlumphy to take Jacqueline to the hospital and she did not want to; Mary Ann told McGlumphy she would take her if McGlumphy did not. McGlumphy did not want to take Jacqueline to the hospital, but she eventually did take her and Mary Ann called the hospital to confirm they arrived. Mary Ann also testified that McGlumphy had performed piercings on her.
 {¶ 65} Mary Ann testified to the following on cross-examination. Appellant did not want to take Jacqueline to the hospital either. Mary Ann left home at 6:30 a.m. the day Jacqueline died and did not return until around 4:00 p.m.
 {¶ 66} Melissa Lewis ("Lewis"), McGlumphy's sister, testified to the following for Appellant. She spoke to McGlumphy on October 4, 2004 and McGlumphy asked her to take the twins for an undetermined amount of time. Lewis testified that McGlumphy wanted to check herself into the hospital. McGlumphy seemed stressed out during the conversation. Lewis told McGlumphy she needed to speak to her husband about it and she told her to call her back that night; McGlumphy did not call Lewis back.
 {¶ 67} Lewis testified on cross-examination that McGlumphy was also upset about money and Lewis told her that Appellant needed to get a job. Lewis testified that at no point in the conversation did McGlumphy say she was going to hurt the children or that something bad was going to happen to them.
 {¶ 68} Appellant then rested his case and renewed his Crim.R. 29 motion. The trial court overruled the motion.
 {¶ 69} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of murder while committing or attempting to commit the offense of endangering children, involuntary manslaughter, endangering children, and felonious assault. The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. While not an exhaustive list, we found the following testimony relevant in determining that Appellant's convictions were not against the manifest weight of the evidence: Appellant's confession to Green; Appellant's access to Jacqueline during the time she was killed; the medical and pathological testimony concerning Jacqueline's injuries and death; Appellant's statements to Henrick that he was never charged with a crime, when in fact he had a child endangering conviction; Appellant's statements to Imhoff that he had checked on Jacqueline about 10 minutes before she was discovered non-responsive; the testimony concerning the amount of time it would take to inflict Jacqueline's injuries; the testimony concerning Appellant's tattoo equipment; and the tattoo needle with Jacqueline's DNA on it.
 {¶ 70} Contrary to Appellant's argument, his convictions were not against the manifest weight of the evidence simply because the jury chose to believe the evidence of Appellant's guilt offered by the prosecution. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. "[I]n reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness." Prince v. Jordan, 9th Dist. No. 04CA008423,2004-Ohio-7184, at ¶ 35, citing State v. Jackson (1993),86 Ohio App.3d 29, 33. We recognize that some of the trial testimony could be viewed as contradictory or in conflict with other testimony, but we find that the jury as the fact finder was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported the conviction of Appellant. See DeHass, supra. Making every reasonable presumption in favor of the judgment, we cannot find that the record weighs heavily against the convictions.
 {¶ 71} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Accordingly, Appellant's second assignment of error lacks merit.
 Assignment of Error Number Three
"THE IMPOSITION OF MAXIMUM AND CONSECUTIVE SENTENCES WAS IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHT TO TRIAL BY JURY."
 {¶ 72} In his third assignment of error, Appellant has argued his sentence violates his constitutional rights. Specifically, he has argued that the trial court erred in sentencing him to maximum and consecutive sentences because such sentences violated his right to a trial by jury. During the pendency of Appellant's appeal, the Ohio Supreme Court and this Court have issued decisions which directly impact his contentions.
 {¶ 73} The Ohio Supreme Court addressed Ohio sentencing guidelines in State v. Foster, ___ Ohio St.3d ___,2006-Ohio-856, and State v. Mathis, ___ Ohio St.3d ___,2006-Ohio-855. This Court interpreted and applied Foster andMathis in State v. Dudukovich, 9th Dist. No. 05CA008729,2006-Ohio-1309. In Dudukovich, we found that Foster held that Ohio's sentencing guidelines were unconstitutional, but that the appellant did not properly preserve his constitutional challenge for appeal. Dudukovich at ¶ 21. In Dudukovich, this Court held that an appellant, if sentenced after Blakely v.Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, waives his constitutional challenge to his sentence if he does not preserve the argument in the trial court. Id. at ¶¶ 22 and 24. This Court questioned "whether [the] Defendant raised a specific challenge to the constitutionality of Ohio's sentencing statutes in the trial court." Id. at ¶ 24. We found that "[a]s Defendant failed to raise any objection below, let alone an objection specifically raising a constitutional challenge, he is precluded from raising such an argument for the first time on appeal." Id.
 {¶ 74} Based on our holding in Dudukovich, we find that Appellant did not properly preserve his constitutional challenge for appeal. The record shows that Appellant was sentenced on March 9, 2005, well after Blakely was decided. While Appellant did object to the imposition of maximum and consecutive sentences in the trial court, his objection was a general objection. Appellant merely stated he objected and did not cite constitutional challenges as the basis. Accordingly, pursuant toDudukovich and well settled case law, to preserve an alleged error one must timely object and state the specific grounds for the objection. Therefore, we find that Appellant is precluded from arguing the sentencing statute's constitutionality on appeal. See Id. and State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, at ¶ 43, appeal not allowed, 99 Ohio St.3d 1546,2003-Ohio-4671.
 {¶ 75} Based on the foregoing, Appellant's third assignment of error lacks merit.
 III {¶ 76} Appellant's three assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Moore, J., Boyle, J., Concur.